Walworth, Chancellor.
The first question for consideration in this case is, whether an association formed under the general bank law of 1838, is authorized to issue negotiable paper for any purpose, except such circulating notes as are countersigned and registered in the office of the comptroller. I have considered these associations, for all substantial purposes, corporations, having the general powers of corporations, except where restricted by the act under which they are organized. And, like other corporations, they can only exercise the powers, and carry on the business, which the statute under which they are created has authorized them to exercise and carry on, either in terms or by necessary implication. For I presume no one can suppose that these associations are authorized to carry on every kind of business which an individual could transact, except such as they are expressly prohibited from transacting by the general bank law. I shall, therefore, examine their powers and their capacities to contract, upon the supposition that they are in fact corporations, created for certain specified objects, and subject to the restrictions in the acts under which they were created and are exercising their powers; and that they *444 have such incidental power and authority as they would have had by the common law or otherwise, if they had been called corporations in the act under which they are organized.
There is no express prohibition in the act of 1838 against making, and putting in circulation as money, notes and bills which are not countersigned and registered in the comptroller’s office. But the general restraining law, as amended by the act of February, 1837, still declares that no person, association of persons, or body corporate, except such bodies corporate as are expressly authorized by law, shall issue any bills or promissory notes, or other evidences of debt, as private bankers, for the purpose of loaning them, or putting them in circulation as money, unless thereunto specially authorized. (1 R. S. 712, § 6 ; Laws of 1837, p. 14.) And the act of 1838, which only authorizes a certain kind of notes to be put in circulation as money, leaves the restraining law in full force as to every other evidence of debt. These banking associations, therefore, are prohibited from issuing any bills or promissory notes, or other eyidences of debt, for the purpose of loaning them, or having them put in circulation as money; whatever forms such evidences of debt may assume. Any officer or agent of these associations, then, who shall be guilty of issuing any such evidences of debt with the intention of having them loaned or put in circulation as money, or who shall directly or indirectly assent to the same, will render himself liable-to the penalty of $1000, mentioned in the restraining law, as the forfeiture for a violation of its provisions. (1 R. S. 712, § 7.) And a negotiable bill or note which is issued contrary to law, or upon an illegal consideration, is void in the hands of any one who takes it with notice of the illegality. So when it appears upon the face of such negotiable securities that they were issued contrary to law, or where there is sufficient to create a suspicion of their illegality and to put the party who takes them upon enquiry, he is not a bona fide holder, and cannot recover on them as such. (Broughton v. The Manchester Waterworks Company, 3 Barn. & Ald. Rep. 1; Wiggin v. Bush, 12 John Rep. *445 306.) Thus, in the case of The Attorney General v. The Life & Fire Insurance Company, (In Chan. 15th March, 1842,) where an insurance company had issued and put in circulation its negotiable bonds as money, or as a circulating medium, in the form of post notes, in violation of the restraining law, and the form and appearance of the bonds were such as to indicate that they probably were made to be thus circulated, the referees to whom the question of the liability of the corporation to the bond holders was referred, decided that it was not liable. And I sustained the decision of the referees, upon the ground that the fact of the illegal issue of the bonds was proved, and that there was sufficient upon the face of them to put those who received them upon enquiry.
But a bill, or any other negotiable security which is not upon its face illegal and unauthorized, is valid in the hands of a bona fide holder without notice, who has paid a valuable consideration therefor, except in those cases in which the security is made void by statute. (Vallett v. Parker, 6 Wend. Rep. 615.) And if this association had the right to give a promissory note or bill in such form as to be negotiable, for any purpose, signed by the cashier of the association only, the plaintiff was entitled to recover in this case. For, where a corporation is authorized to give a negotiable security for any purpose, and there is nothing to show what the particular security was given for, if there is nothing upon the instrument itself to create a suspicion that it was issued for an illegal object, the court will presume that it was given for a legitimate purpose, rather than for a purpose which was unauthorized and illegal. It has frequently been decided that a corporation which has the right to contract debts, may give a negotiable note or bill, in payment or security for sUch a debt; unless such corporation is restrained by its charter or by statute, from doing so. Thus, in the case of Mott v. Hicks, (1 Cowen’s Rep. 513,) where a company had been incorporated for the manufacturing of glass, the supreme court held that a note given by the corporation, by its president, payable to the order of Horsfield, was a valid *446 note in the hands of the endorsee. And in Barker v. The Mechanics’ Fire Insurance Company, (3 Wend. Rep. 94,) it was held that, although an insurance company could not make and issue notes which were intended for circulation as bank paper, the corporation might give a note for a debt contracted in the course of its legitimate business. (See also Major v. Hammond, 9 Barn. & Cress. 363.) If these banking associations then are in fact corporations, as the supreme court has very properly decided that they are, I can find nothing in the act under which they are organized which prohibits them from giving negotiable notes or drafts in payment of the rent of their banking houses, the salaries of their cashiers and clerks, and for many other purposes connected with the legitimate business of banking. And, for any thing that appears to the contrary, the draft set out in this record was given in payment of such a debt j though, out of the case, it may perhaps be shown that it was made to be put in circulation' as money.
The objection, however, that the instrument given" in evidence was not executed in the manner required by the twenty-first section of the general banking law, so as to make it a valid and binding contract which could be sited on as such by an endorsee, is one which I have in vain endeavored to overcome ; for I have no doubt the plaintiff took this draft in good faith, believing it was valid and binding upon the association. The twenty-first section of the general banking law declares in express terms, that contracts made by any such association, and all notes and bills by them issued and put in circulation as money, shall be signed by the president or vice-president and cashier thereof. This is an entirely different provision from that contained in the charter" of the Derby Fishing Company, upon which the decision was founded to which we were referred, from the state of Connecticut. (2 Conn. Rep. 252.) There the provision was that all policies of insurance made by the company, signed by the president, and countersigned by the secretary, should be binding on the company according to the terms and tenor thereof. This is a very com *447 mon provision in the charters of insurance companies and incorporated banks, and was originally inserted in such charters to obviate the ancient common law rule that a corporation could only contract by deed under its common or corporate seal •, and also to relieve the holder of the policy of the company, or the note of the bank, from the burden of proving that the officers who signed such policy or note were authorized by the corporation to make the contract. In cases of that kind, the statute simply declares that contracts thus signed shall be binding upon the corporation ; but not that all contracts shall be executed in that form, so as to deprive the corporation of the power to contract under its corporate seal, as it was authorized to do by the common law, or to make a contract in any other form which the law allows. When the legislature, however, declare that all contracts made by these associations shall be signed in a particular way, I am not prepared to admit that the court is authorized to say that a valid written contract may be made in a different form. This, of course, does not include a class of contracts that are never in fact made by the association, but which arise by operation of law merely, as, in the ordinary case of an implied assumpsit to repay moneys deposited by dealers with the bank. In such cases the certificate of the cashier or teller, or the entry in the pass-book of the customer, is not a contract; it is only evidence of a fact, which might be proved by parol, to raise an implied promise by operation of law. But a negotiable note, draft or bill of exchange is an actual contract; and it must be in writing, and properly signed, to enable a third person to recover on it as the endorsee or bearer of the instrument.
The late Chief Justice Marshall says, it is a general rule that a corporation can only act in the manner prescribed by law. Again, he says : “ Without ascribing to this body, which in its corporate capacity is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it, to derive all *448 its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes.” (Head, & Amory v. The Providence Insurance Company, 2 Cranch, 167.) I am not prepared to say this language was properly applied to the case then under consideration ; in which the provision in the charter was similar to that contained in the act incorporating the Derby Fishing Company. But Mr. Justice Story, in a subsequent case, (12 Wheaton, 68,) sanctions it in its full extent. And in the very recent case of The Bank of Augusta v. Early, (13 Peters, 587,) Chief Justice Taney, in delivering the opinion of the supreme court of the United States, says, “ it may be safely assumed that a corporation can make no contracts, and do no acts either within or without the state which creates it, except such as are authorized by its charter ; and those acts must also be done by such officers or agents, and in such manner as the charter authorizes.”
In the language of one of these distinguished judges, therefore, I must say, 11 if the statute imposes the restriction, it must be obeyed.” And the statute of 1838, having said, in so many words, that contracts made by such associations shall be signed by the president or vice president and cashier thereof, a bill of exchange, or draft, signed by the cashier only, is not a valid written contract and security, which can authorize an endorsee to recover thereon against the association, in a suit at law in his own name, and without showing that he has paid money thereon which has been applied to the use of the association so as to create a contract by operation of law.
I must, therefore, vote to affirm the judgment of the supreme court.
Paige, Senator.
Parol agreements made by the authorized agents of a corporation, in relation to matters within the scope of its legitimate business, are deemed the express contracts of, the corporation itself; and all duties imposed by law, and all benefits conferred by request of the corporation, raise an implied promise on which an action may be maintained. (Danforth v. *449 Schoharie Turnp. Co., 12 John. 230.) It is well settled also, that a corporation may give a promissory note for a debt contracted in the course of its legitimate business, though not specially authorized to do so by statute. (Barker v. Mechanic Ins. Co., 3 Wend. 94.) But where the mode of executing written contracts by a corporation has been prescribed by statute, it cannot be departed from. (Mechanics’ Bank v. Bank of Columbia, 5 Wheat. 326 ; Ang. & Ames on Corp. 164.) However, if the contract be void because of a defective execution, the consideration received, or the original debt for which the contract was given, may be recovered by action. These remarks apply to banking associations, whether they are or are not corporations ; for I have no doubt that such institutions may give promissory notes or bills of exchange payable after date, without being countersigned in the comptroller’s office, for debts legitimately contracted. Such notes or bills must, however, be signed by the president or vice president and cashier, as required by the 21st section of the act to authorize the business of banking. (Sess. L. of ’38, p. 250.) I am of course speaking of bills and notes not intented for circulation as money ; for, if issued for that purpose, they must not only be signed by the officers mentioned, but must also be countersigned in the comptroller’s office. I am of opinion that, even before the act of 1840, (Sess. L. of’ 40, p. 306, § 4,) banking associations had no right to remit funds in any other way than by sight drafts; but however that may be, there can be no doubt, I think, that the bill in question is void, because not executed in the manner required by law.
It cannot be maintained that the power to buy and sell bills of exchange, which is given by the 18th section of the general banking law, confers the right to issue paper like that on which the plaintiff seeks to recover; for there is a manifest difference between issuing, and buying and selling bills already issued. It might be said, with equal propriety, that, because banking associations are authorized to buy and sell foreign coins, they may manufacture such coins.
*450 Although the bill in question is void by reason of a defective execution, yet it does not on its face appear to have been given for an illegal consideration. A bona fide endorsee of the paper might, therefore, recover the consideration paid for it in an action against his immediate endorser, and the original creditor could collect of the association the debt or consideration for which it was delivered to him, provided such debt or consideration came within the legitimate purposes of the association. Although the plaintiff cannot maintain this action, I have no doubt he can recover of Keeler & Durant the money paid to them on the transfer of the bill. The latter have the same remedy against Dodge, their immediate endorser, who may in like manner recover of the association, provided the bill was founded on a legal consideration.
For these reasons I am in favor of affirming the judgment of the supreme court.
Hopkins-, Senator.
The supreme court put its decision of this cause upon considerations of public policy, grounded upon the assumption that the draft or bill upon which the suit was brought, was issued for circulation as money, or at least as an unlawful circulating medium. Other objections to the validity of the paper have been urged by counsel and will be considered ; but this is the great feature of the case, and that with which the opinion of the supreme court is wholly occupied. It becomes important then to enquire, what the charter of the paper is, in this respect. There is no evidence in the case in relation to it, except what may be inferred from the form and contents of the draft itself, of which a printed copy only is given ; and from which it would seem not to differ in appearance from ordinary drafts in writing, or, at most,'printed with common type,on ordinary paper, as contained in the case. There is no evidence that it bore any resemblance to bank bills or circulating notes, nor was any such objection raised on the trial. If it bore any similitude to such paper, it might easily have been shown ; and, in the absence of such testimony, we *451 must presume that it only had the appearance of an ordinary draft or bill of exchange, drawn by one bank or commercial house on another. . The appearance of the paper itself, produced before us on the argument, does not conflict with this view of it. It was for the sum of $3000—a sum not usual in bills circulated as money. It was drawn payable thirty days after -date, to the order of the payee, and by him endorsed to the order of the endorsees. It was written upon its face to be without acceptance till due, and was signed by only one officer ; a piece of paper, it would seem, in no respect calculated to circulate as currency, and evidently not intended as an evasion of the law in that respect. Indeed, the supreme court'in a latercase, (Smith v. Strong, 2 Hill, 241,) rather abandon the idea that such paper is used as a circulating medium, but urge that, by giving it validity, it may become such. I humbly conceive that the paper described in this case, being as it is without security, except such as is derived from the endorsers, could in no way obtain circulation as money or be used as a circulating medium, any more than like negotiable paper of individuals or private corporations. It is, to be sure, negotiable, but that was necessary for the purpose of convenient and safe remittance. Beyond this, it is not a description of paper calculated to become a circulating medium, and is in no sense calculated to circulate as money. The institution issuing it held out no security for its payment—the shareholders even not being necessarily liable, nor were the drawees to be asked to become liable—and it could obtain no confidence in community, except so far as the names of the endorsers might give it character. If this paper is to be condemned as forming an unlawful currency or circulating medium, then, by consequence, all bills of exchange and negotiable paper of the kind, by whomsoever issued, must be deemed a nuisance, and public policy requires such paper to be declared void. And yet, we find that it has peculiar privileges over other evidences of debt, and receives special favor and protection by our laws as one *452 of the greatest conveniences and most valuable aids to commerce and business generally.
It would seem that the paper in question was such as not to have excited an idea on the trial that it could be used as a currency or circulating medium in any sense. If it was of a character to admit even of a difference of opinion, the point should have been raised, and opportunity given to the plaintiff to adduce evidence upon the question. The fact is no where found by the jury, nor is it even presumed by the judge who tried the cause ; indeed, the parties themselves throughout the case designate the paper simply as a“ draft.” If then no evidence is shown and nothing appears on the face of the paper to render it objectionable as being issued for circulation as money, or as forming a circulating medium in any different sense than ordinary negotiable paper of the kind, certainly we cannot be justified in presuming that there was an intent to issue it for such purpose, and especially we cannot presume that the plaintiff had any knowledge of such intent. It is a rule of law that a person shall be deemed innocent till proved guilty; and the rule extends to cases of fraud as well as crime. “ Honesty, not fraud, is to' be presumed,n says Justice Cowen in Starr v. Peck, (1 Hill, 373,) where the rule is fully recognized as applicable to cases of fraud.
The supreme court infer that the plaintiff is chargeable with notice that the bill was a nullity, because on the trial he came forward with proof that the bank which issued it was an institution under the general banking law. They say, this proof struck his claim with death. Now it was necessary for him to adduce such proof to sustain his suit in form against the president ; but, that such proof was adduced, on the trial, is not evidence that, at the time he received the draft, he knew the legal character of the bank. The court admit that he must be intended: to be an innocent holder, so far as regards any knowledge that the bank on which the draft was drawn was an institution under the general banking law, because no proof wasr offered on the trial that it was such an institution. It is diffi *453 cult to conceive why he should be deemed any more acquainted, at the time he received the draft, with the legal character of the bank which drew it, because afterwards, on the trial, proof was adduced to show that character. It can only be by a presumption, contravening the rule laid down by Mr. Justice Cow-en, just referred to. It was conceded that the court could not know judicially that the drawees were not a corporation which might issue all kinds of negotiable paper; and I do not see why the plaintiff was any more bound to know, when he received the draft, that the drawers were not a corporation that might issue all kinds of negotiable paper, even supposing that they have not such right for any purpose.
But in Smith v. Strong, (2 Hill, 241,) where the plaintiff in a suit against an endorser of such paper was not under the necessity of adducing the proof, which it is said in this case struck the plaintiff’s claim with death, the court found it necessary to go further, and argued that the plaintiff was tobe presumed to have had notice, because the draft or bill purported on its face to have been issued by a bank. The illegality of its circulation, and its invalidity in the hands of the plaintiff, were consequently made to depend upon the fact that it purported to be issued by a bank, no matter what its appearance might otherwise have been. If the court is driven to this criterion, as it must be in suits between endorsers and endorsees, then, consequently, the paper of an institution or of an individual banker, doing business under some other name than that of a bank, whose paper would not purport upon its face to be issued by a bank, might have validity to some extent and enjoy a privilege of circulation which the same paper could not enjoy if issued under the name of a bank, although issued under the saíne law. An institution under the general banking law might legally, and sometimes perhaps appropriately, adopt the name of “ Paper Manufacturing Company,” under which name their drafts might be received without enquiry ; but if it adopt the name of a bank, as it has an equal right to do, then the same drafts would be deemed to be a circulating medium and void *454 in the hands of every one, for want of being countersigned by the comptroller. If the word “ bank” on a draft, is to alter its character and make it a circulating bank bill, although having no resemblance to circulating bills, then must all drafts and bills of exchange issued by safety fund banks, though to an indefinite amount, be within , the security of the safety fund. I do not think that so much effect is to be given to such a use of the word. I think the plaintiff must be deemed a bona fide holder, so far at all events as regards any intention, either on his own part or that of the drawers, to give circulation to the draft as an unlawful currency or circulating medium.
But conceding that the paper was not issued for circulation as money, and was not likely to come in use as a circulating medium, still, it is objected, that the bank had no authority to issue drafts for any purpose; and it is contended that, although the statute does not expressly prohibit it, nor anywhere declare such paper void, yet the bank may set up its own wrongful act of issuing it without authority, to protect itself from payment. I shall examine the question whether such a defence may be maintained, even if the paper was issued without authority; but will first enquire whether it was so issued. If the bank had authority to draw drafts at all, there was no provision, at the time this was drawn, against its being payable at a future day. The act of 1840 providing against it had not been passed.
What then do we find in the general banking law of 1838 upon the question 1 We find in several places a recognized distinction between bills and notes to be issued for circulation as ■ money, and other paper not intended for such purpose. In regard to the former, we find that the act professes to provide every possible security for the protection of the public, in relation to paper to be issued for circulation as money ; while it holds out no security for the latter, and does not profess to protect other creditors of the banks, but leaves them much to their own watchfulness and vigilance. It even exempts the shareholders from liability, unless they elect to become liable. The 7th clause of the 26th section of the act contemplates the *455 issue of evidences of debt, other than bills and notes. It also requires a statement of bills and notes generally, or without adding “ issued for circulation as money while the 9th clause requires a statement of bills and notes issued for circulation as money. The 29th section allows fourteen per cent, interest in case of non-payment of bills or notes issued for circulation as money. The 31st section prohibits paper issued for circulation as money of a less denomination than $1000 being made payable at any other place than the office of the bank issuing it. The 21st section requires <£ contracts made by any such association, and all notes and bills issued and put in circulation as money f to be signed by the president, or vice president and cashier ; leaving the inference that there might be other bills and notes not issued for circulation as money that would not be subject to such interest, that might be payable elsewhere than at the office of the bank issuing them,, and might be signed otherwise than is prescribed for paper to be issued for such circulation.
But more direct authority, I think, is found in the 18th section, which authorizes the carrying on of the business of banking, and the exercise of all incidental powers necessary to carry on such business ; for such I think is the fair construction of that section as regards incidental powers. Among those powers must be implied that of drawing and transferring funds by draft—without which a bank, at least in the country, would no doubt find itself greatly embarrassed in its appropriate business transactions. It may be said that in this case there were no funds to transfer; but if so, it does not appear that the plantiff knew such to be the case when he received the draft. If it is said that the draft was payable at a future day, it may have been drawn against funds subject to draft only on a future day, or the bank may have just purchased, as it had a right to do, a draft on the same drawees, for a larger sum, payable at the same time. If the bank had a right to draw a draft for any purpose, the abuse of the right, certainly, should not prejudice an innocent holder.
*456 But if there is not sufficient express authority in the act, there is no prohibition ; and I see no reason why these banking associations or corporations, if they are to be so called, have not the same right to make such paper, as manufacturing and other corporations, which, like these banking associations, are organized under a general law conferring no direct authority to make negotiable paper, but whose power to do so is nevertheless fully recognized. (Mott v. Hicks, 1 Cow. 513; Moss v. Oakley, 2 Hill, 266.)
It is further objected that the draft is not signed by the president or vice president as well as cashier, according to the 21st section of the act, which requires contracts made by such associations, and all notes and bills issued for circulation as money, to be so signed. The term u contract ” is ordinarily applied ' to agreements where both parties become' obligated. And although notes and bills, -where but one party is dound, are technically contracts, yet they are not so designated in ordinary legal phraseology. If the word u contract” was intended to include all paper, why was it followed by the clause specifying notes and bills issued for circulation ? I do not think the provision of the 21st section of the act was intended to apply to drafts or bills not ‘intended for circulation as money, drawn in the ordinary course of banking business for transferring the funds of the bank. If the bank had purchased a bill of exchange or draft payable to its older, which it wished to sell again, as it has a right to do, is it reasonable to suppose that it must be endorsed by both president and cashier 1 And yet the endorsing is as much a contract as the drawing of a bill. So also with respect to certificates ■ of deposit. Such a construction of the law would subject the banks to unnecessary inconvenience and expense. As before remarked, that provision being made expressly applicable to bills and notes issued for circulation as money, leaves the inference that bills of exchange and negotiable paper not intended for such purpose, may be signed otherwise. But if the provision does extend to such paper, I see no reason for it except the protection of the bank ; *457 and if the bank sees fit to waive the formality and to pay its paper of this description not having the signature of the president, as was admitted in this case to have been its custom, I think it should be concluded by it. ,
It is perhaps one of the most attractive features of the law, that there are certain general principles which form prominent land-marks, not only to guide the jurist and lawyer, but which are of such obvious import and so consonant with correct views of right and wrong as to be recognized by the community generally as their rules of right action. They even become maxims in law; and just so far as we depart from them, so far are we pretty certain to depart from the safe paths of justice. Among them is that which declares that no, one shall be permitted to take advantage of his own wrong. “ JVullus commodum capere potest de injuria sua propria.” This is a rule of such binding force as to be held obligatory against the wrongdoer, even as between himself and one cognizant or even participant of the wrong. If one, for the purpose of defrauding his creditors, conveys his property to another, he cannot set up the fraud to avoid the deed as between himself and his accomplice even. (Jackson v. Garnsey, 16 John. R. 189.) It is against public policy to allow such conveyances; but the fraudulent grantor is not permitted to set up such considerations, nor will courts interpose them as between him and his accomplice or grantee knowing the fraud. As to his creditors, the statute declares the conveyance void, and it must of course be so ; but even then it will not be held void as against an innocent purchaser from the fraudulent grantee. (Anderson v. Roberts, 18 John. R. 512; Jackson v. Henry, 10 John. R. 185.)
The decision of the supreme court in the present case reverses the maxim, and allows a party to take advantage of his own wrong, even as against an innocent third party; and thus, under the plea of protecting the public, he is allowed in fact to protect himself at the expense and loss of the injured individuals in part at least composing the public. Is the object attained even at this sacrifice of individual rights 1 On the con *458 trary, would not the object of protecting the public be more certainly attained by adhering to the maxim, which at least would be certain to protect some of the individuals constituting the public 1 Besides, if the public seeks any other protection than that afforded to individuals—-if it seeks to enforce compliance with its laws, it should be by becoming parties litigant and pursuing the proper public remedies (if it has deemed the matter of importance enough to provide any) for the punishment of the wrong-doer and to restrain him from further wrong. If it has not provided remedies, it should do so, and not let individuals suffer. In the case of the fraudulent conveyance, creditors cannot take advantage of the fraud except by becoming parties to a suit, and even then innocent third parties are not allowed to suffer.
It is against public policy undoubtedly, that a safety fund bank should issue bills to be circulated as money, beyond the amount allowed by its charter; but would the bank be permitted to set up such a consideration, to defeat payment to a bonafideholder 1 If the holder received the bills knowing them to be so issued, creditors of the bank might interfere, just as credi • tors may interfere to avoid a fraudulent conveyance. It must be as much against public policy to allow safety fund banks to issue drafts or bills of exchange, as it is to allow an institution under the genéral banking law to do so ; and yet that privilege will hardly be denied them, although, since the passage of the act to restrict the liability of the safety fund, the public have no more security for payment in one case than they have in the other. If they can issue such paper at all, they may do so to an indefinite amount. If it is said that their charters allow it, then it may be said to be a legislative expression that it is not against public policy to allow it. The expressions used in the charters and in the general banking law, so far as regards u bills of exchange,” arealike; and although the clause which authorizes the safety fund banks to issue “ notes and bills” is not connected with the provision for their security, that being contained in a separate general law, yet it was, no *459 doubt, equally the intention of each system, to provide security for all paper to be issued for circulation as money, and to leave the public and individuals to their own vigilance as regards other dealings with the banks.
It is notorious that the object of the general banking law was to do away the necessity and evils of applications to the legislature for charters under the safety fund system ,• and as it would of course supersede that system, if the object is carried out, there can be but little doubt that the same general privileges, as regards the business of banking, were intended to be conferred by the new system. An act passed in 1835 recognizes the right of safety fund banks to make 6< drafts.” If it was the intention of the legislature to prohibit banks organized under the general banking law from exercising a privilege recognized and allowed in other banks and other corporations, though not expressly conferred, or if such paper was considered so great a nuisance, why was it not expressly prohibited, as might have been done in five words 1 Why were there so many expressions used, from which authority to issue such paper might well be inferred 1 And particularly, why did not the act of .1840 expressly provide against it, instead of merely providing against what seems to have been considered the only objectionable feature, that of being payable at afuture day 1
The statutes no where prohibit banking associations from drawing drafts or bills of exchange, nor do they any where declare such paper void, as is the case with usurious paper and prohibited paper generally. Now it is a well settled principle, that illegality of consideration is no defence against a recovery upon negotiable paper in the hands of a Iona fide holder, unless the statute which makes it illegal also expressly declares that the note or security shall be void. See the cases cited in Chitty on Bills, 116, where is quoted the language of Lord Kenyon, that u a contrary determination would shake paper credit to the foundation.” The doctrine was adopted by our supreme court in Vallett v. Parker, (6 Wendell, 615,) where Chief Justice Savage says : “ It is all important to the commercial world, *460 that courts do not go in advance of the legislature in rendering negotiable paper void in the hands of an innocent endorsee. Wherever the statutes declare notes void, they are and must be so, in the hands of every holder ; but where they are adjudged by the court to be so, for failure or the illegality of the consideration, they are void only in the hands of the original parties, or those chargeable with notice.”
Is this, then, a case in which the courts may “ go in advance of the legislature in rendering negotiable paper void,” or one in which they are called upon to interpose considerations of public policy to the sacrifice of individual rights 'l Or rather, did not the circumstances and state of the mischief intended to to be guarded against, require that the bank should be compelled to pay its paper of this description 1 If it was issued for the purpose of putting forth a spurious circulating medium, or otherwise to impose upon the community, and the purpose was so far carried out as that the paper was allowed to be protested and sued, it is more than probable that all the mischief was accomplished that could well arise, except such as would result from non-payment. Such attempts to impose upon the community have always but a brief success. The fraud is soon known and the mischief arrested, except that greatest of all, arising from non-payment. Then certainly considerations of public policy, if allowed at all, required that payment should be compelled. Had not the evil in this instance had its day, so far at least as regards the issue of the paper 1 Although the draft was issued before, yet the trial did not take place till after the passage of the act of 1840, prescribing penalties which it is presumed were adequate to put an end to the further issue of such paper, so far as regards its objectionable features ; and the only evil that remained to be provided against, was nonpayment—the gist of the whole. Compel payment, and you not only remedy the evil, but inflict on the wrong-doer the only punishment that perhaps could be inflicted.
To declare such paper void, must, instead of preventing, tend rather to encourage and aggravate the evil. It holds out inducements to the fraudulent and reckless to enter upon further *461 attempts at similar frauds. Under some new and deceptive form, they succeed for a brief time in imposing their trash upon the community, notwithstanding similar issues may have been declared void—pocket the fruits of their fraud, and not caring to pursue their fraudulent purpose further, or finding they cannot longer pursue it, gladly embrace the opportunity which the courts would afford them of setting up their own fraud to protect themselves in their unlawful gains. If no penalties have been imposed to meet the case, they go free and protected, while the innocent victims of their fraud alone suffer.
But it may be said that although the draft in this case is void and cannot be recovered on, yet the consideration paid for it may be recovered in a suit for that purpose. If so, then the object attempted to be attained by declaring the paper void, is easily defeated by mere circuity of action, or by merely adopting a different form of action. Under the decision of the supreme court in this case, all are deemed parties to the illegality; consequently no recovery can be had by one party against another. A party receiving a void note, with notice, cannot recover the consideration paid for it. (Nellis v. Ciark, 20 Wendell, 24.) If the plaintiff cannot recover on the draft in this case, the supreme court have undoubtedly decided correctly in Smith v. Strong, before referred to, in which, since the decision of the present case, that court have expressly held that the endorsee cannot recover against the endorser of such paper. If then the plaintiff cannot recover in this suit, he is remediless.
I am of opinion that institutions organized under the general banking law have, as an incidental power, the right to draw bills of exchange or drafts, in the ordinary form, not having the similitude of circulating bills, for the purpose of transferring their funds in the ordinary and legitimate business of banking. Since the act of 1840, they must be payable on demand, or, which I presume is the same thing, at sight. The provision of that act in this respect does not appear to be restricted to bills and notes to be issued for circulation as money, but extends to bills and notes generally.
*462 I do not think that the provision of the general banking law, requiring contracts made by such associations, and bills and notes issued for circulation as money, to be signed by the president or vice president and cashier, was intended to be applicable to the drawing or endorsing of bills of exchange or paper of the description proved in this case, not intended for such circulation. Or, if it does apply, I am of opinion that it can only be for the benefit of the bank ; and if it waives that formality and pays paper of that description, not so signed, as was admitted to have been its custom, it should be bound by it.
But if the general banking law does not confer authority to draw bills of exchange, it does not prohibit it, nor declare paper issued by those banks without authority, void; and I am of opinion that considerations of public policy do not require courts to declare it void in the hands of a bona fide holder, but rather that the banks should be compelled to pay.
I am therefore of opinion that the judgment of the supreme court, in this case, should be reversed.
Bockee, Senator.
I have no doubt that the bill of exchange upon which this suit is brought was issued by authority of the association, that its issue was authorized by the general banking law, and that the plaintiff in error ought to recover. The eighteenth section of the act authorizes associations organized under the general bank-law,<£ to carry on banking business by discounting bills, notes and other evidences of debt • receiving deposits ; buying and selling gold and silver bullion, foreign coins and bills of exchange ; loaning money on real and personal security ;” and further,££ to exercise such incidental pow ers as shall be necessary to carry on such business.” Buying and selling bills of exchange is an expressly granted power. It seems to me that the power of drawing bills is fairly included in, or at any rate is incidental to the power of buying and selling. In the business of exchange, mutuality is necessity. If a banking association buy bills of exchange, and its funds accumulate at any point, why may it not draw as well as sell *463 bills of exchange ? The drawing is a prerequisite to the sale of a bill; and there is no restriction in the act limiting the association to the sale of such bills as it may have previously purchased. The drawing of bills of exchange is a usual, ordinary branch of the business of banking, without which it could not be conveniently transacted, and which it can hardly be presumed the legislature intended to prohibit. Bills of exchange are instruments essentially different in their nature and uses from the notes and bills contemplated by the provisions of the act of 1838, which are to go into circulation as money and constitute a part of the currency of the country. The several provisions and restrictions applicable to such notes or bills cannot, with any semblance of reason, be applied to bills of exchange. Does any one suppose that bills of exchange are to be made payable at the office or place of business whence they are issued 1 Equally preposterous is the idea that a bill of exchange issued by a banking company must be secured by a mortgage or deposit of stock with the comptroller, and countersigned by the register. The supreme court seem to apprehend that a recovery against the defendant in this case would break down all those salutary restraints which the legislature have interposed to guard the public against'a spurious currency. Let us examine the merits of this proposition, and enquire whether it can have any other force or effect than to sustain an ungracious defence and cheat the honest citizen out of his rights. • If banking associations should issue paper in any form not authorized by the act of 1838, for circulation as money, what follows 1 I suppose the provisions of the restraining act are in full force, and that they would be subject to its penalties. Moreover, every bill or note discounted or security taken by them on such illegal loan or issue, would be void and irrecoverable. These penalties and forfeitures appear to me to be a sufficient guard against the evils anticipated by the supreme court; and if they are not sufficient, it is the province of the legislature, not of the courts, to provide additional safe-guards. It would not be wise to protect the public against the possible contingency *464 of loss, by subjecting them to the certain and immediate loss of the amount of such spurious and illegal circulation. Let it be conceded that the bill in question is liable to the objection of having been loaned and put in circulation as money j although such fact does not appear in the case. Why may not the holder, who it appears has paid a valuable consideration, and is not justly chargeable with any malafides, recover on it 1 It is not made void by the act of 1838, nor by the provisions of the restraining act, (1 R. S. 711,) nor by any other enactment of the legislature which I have been able to discover. The fourth section of the act of 1840 amending u the act to authorize the business of banking,” which makes it a misdemeanor to issue any bill or note unless payable on demand, was passed subsequent to the issuing of this bill of exchange and its transfer to the plaintiff in error. That act does not make the notes or bills issued and payable on time void ; and its penalties of fine and imprisonment apply, not to the holder of the paper, but to the officer or member of the association who illegally issues it. The fifth section of the restraining act makes void” all notes and other securities for the payment of any money, &c. made or given to any such association, institution or company, that shall be formed for the purpose expressed in the first section of this title, or made or given to secure the payment of any money loaned or discounted by any incorporated company or its officers, contrary to the provisions of the third section of this title.” It is not the notes or securities illegally issued by the company which are made void by the act, but those which are given to the company on the loan or issue of notes or other securities of debt to be put in circulation as money. The penalty or forfeiture is properly inflicted upon those who violate the law, and not upon the innocent holders of the paper illegally issued. Had the legislature been weak enough to have made these notes and securities void in the hands of the holder, it would have been offering a premium to those who transgressed the law, and inflicting heavy forfeitures upon the *465 innocent and unoffending. It would have been very analogous to the proceeding of the Irish mob, which' sought to ruin a banker to whom they were hostile by burning all his bills in circulation. The decision of the supreme court is founded mainly upon the presumption that bills like the one in question might be used to supply the ordinary circulating medium. It is true, they might be so used, although very inconvenient and inappropriate for such a purpose ; and so might common bank checks in their usual form of negotiability be used for circulation as money. If the doctrine of the supreme court be correct, every check drawn by the cashier of a company organized under the general banking law is a nullity. I am the Iona fide holder of a check drawn by the cashier of the Merchants’ Exchange Bank of this city, upon another bank. The supreme court tell me it is a nullity because it is not made payable at the office whence it issued ; it is a nullity because it has not passed the ordeal of the comptroller’s office; or perhaps because the bank has not in its vaults, in specie, twelve per cent, of the amount of bills issued. They tell me moreover, that I am. a mala fide holder of paper issued contrary to public policy, not to say contrary to public morals; that I have not obtained the better security—that of mortgages and stock deposited with the comptroller—and therefore I shall lose the security which I have, and the bank which issued the illegal paper shall be gainers to the same amount. A decision producing such results cannot easily be reconciled with ordinary sound discretion and with the equity of our laws. The decision of the supreme court ought to be reversed.
Senators Dickinson, Platt and Root also delivered written opinions in favor of reversing the judgment of the supreme court ; and the President delivered a written opinion in favor of affirming the judgment.
On the question being put, “ Shall this judgment be reversed 1” the members of the court voted as' follows:
*466 For reversal: Senators Bockee, Clark, Dickinson, Hawkins, Hopkins, Hunt, Nicholas, Peck, Platt, Rhoades, Root, Varney and Works—13.
For affirmance: The President, the Chancellor, and Senators, Bartlit, Faulkner/ Hard, Paige, Ruger, Scott and Varían—9.